**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**FT. MYERS DIVISION**

**LUZ LASTRA,**

      **Plaintiff,**

**-v-**                                    **CASE NO. 2:09-cv-519-FtM-DNF**

**MICHAEL J. ASTRUE,**
**Commissioner of Social Security,**

      **Defendant.**

_____/

**OPINION AND ORDER**[1]

Plaintiff filed an application for a period of disability and disability insurance

benefits [DIB] on June 21, 2004 and for Supplemental Security Income [SSI] on August 22,

2005, alleging an onset of disability of February 28,  2004 (Tr. 19, 518-23).  The Agency

denied this application in initial and reconsideration determinations (Tr. 90-91, 42-44, 95-

97).  Plaintiff timely requested and appeared at a hearing on June 20, 2008, before

Administrative Law Judge (ALJ) Dores D. McDonnell, Sr. (Tr. 29).  In the hearing decision

dated August 26, 2008, the ALJ found Plaintiff not disabled (Tr. 29).

---

[1]     Both parties have consented to the exercise of jurisdiction by a
magistrate judge, and the case has been referred to the undersigned by
an Order of Reference signed by Judge Richard A. Lazzara  dated
October 26, 2009.  (Doc. 16).

The ALJ's decision became the final decision of the Commissioner when the Appeals Council denied Plaintiff's request for review. [Tr. 3-6]  The ALJ's final decision is now ripe for review under sections 216(I), 223(d) and 1614(a)(3)(A) of the Social Security Act.

The Commissioner has filed a transcript[2] of  the proceedings (hereinafter referred to as "Tr." followed by the appropriate page number), and  the parties have filed legal their memoranda.  For the reasons set forth below, the Court finds that the Commissioner's decision is due to be **REVERSED AND REMANDED.**

## I.    SOCIAL SECURITY ACT ELIGIBILITY, THE ALJ'S DECISION AND STANDARD OF REVIEW

Plaintiff  is entitled to disability benefits when she is unable to engage in substantial gainful activity by reason of  any medically determinable physical or mental impairment which can be expected to either result in death or last for a continuous period of not less than twelve months.  42 U.S.C. §§ 423 (d) (1)(A); 1382c(a)(3)(A).  The Commissioner has established a  five-step sequential evaluation process for determining whether  Plaintiff is disabled and therefore entitled to benefits.  *See* 20 C.F.R. § 416.920(a)-(f); *Crayton v. Callahan*, 120 F.3d 1217, 1219 (11th Cir. 1997).  Plaintiff bears the burden of  persuasion through Step 4, while at Step 5 the burden shifts to the Commissioner. *Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987).

---

[2]    The transcript in the instant case has primarily been translated from Spanish to English. Therefore, many of the physicians' first names and last names are not legible.

The decision of Administrative Law Judge  Dores D. McDonnell, Sr. , August 26, 2008, found Plaintiff was not under a disability as defined in the Social Security Act, at any time from February 28, 2004, the alleged onset date, through the date of the decision, 20 C.F.R. 404.1520(f) and 416.920(f) (Tr. 28).

At Step 1 the ALJ found  Plaintiff  had not engaged in substantial gainful activity since her alleged onset date of February 28, 2004 through the date of the decision (Plaintiff's date last insured ("DLI") is December 31, 2009). (Tr. 13).   At Step 2 the ALJ found Plaintiff suffered from severe impairments of osteoarthritis; lumbar degenerative disc disease (DDD) with radiculopathy; carpal tunnel syndrome (CTS); thoracic outlet syndrome (TOS); chronic fatigue syndrome (CFS); myofascial pain syndrome; and patellar degenerative joint disease, anserine bursitis and venous insufficiency (Tr. 22).  At Step 3 the ALJ found through the date of decision,  Plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (Tr. 23).  At  Step 4  the  ALJ  determined Plaintiff  has  the residual functional capacity to perform medium work, but has a "moderate loss of attention span" (Tr. 24, Finding 5).   At Step 5 the ALJ found Plaintiff was able to perform  her past relevant work as a Spanish-speaking security guard (Tr. 28).

In reviewing a decision by the Commissioner, the District Court is bound to uphold the Commissioner's findings if  they are supported by substantial evidence and based upon proper legal standards.  42 U.S.C. §§ 405(g), 1383(c)(3); *Lewis v. Callahan*, 125 F.3d 1436,

1439-40 (11th Cir. 1997).  Factual findings are conclusive if supported by "substantial

evidence," which is more than a scintilla and consists of such relevant evidence as a

reasonable person would accept as adequate to support a conclusion.  *Lewis v. Callahan*,

125 F.3d at 1440.  The Court does not decide the facts anew, reweigh the evidence, or

substitute its judgment for that of the Commissioner.  *Wilson v. Barnhart*, 284 F.3d 1219,

1221 (11th Cir. 2002).  If the Commissioner's decision is supported by substantial evidence,

the Court must affirm even if the evidence predominates against the decision. *Wilson v.*

*Barnhart*, 284 F.3d at 1291.  However, the Court must conduct an exacting examination of

whether the Commissioner followed the appropriate legal standards in deciding the claim

and reached the correct legal conclusions.  *Wilson v. Barnhart*, 284 F.3d at 1291.  The

failure to apply the correct law or to provide the reviewing court with sufficient reasoning

for determining that the proper legal analysis has been conducted will mandate reversal.

*Keeton v. Department of Health and Human Servs.*, 21 F.3d at 1066.

## II.  Review of Facts and Conclusions of Law

**A.      Background Facts:**

Plaintiff was born on June 1, 1950  (Tr. 518), and  was fifty-eight years old at the

time of the August 26, 2008, hearing decision (Pl. Br. Pg. 2).   Plaintiff reported she has a

high school education (Pl's Br. Pg. 2)) and has worked in the past as a Spanish-speaking

security guard, social worker, secretary, dietary supervisor, and physical therapy technician

(Tr. 140, 145, 225, 233). Plaintiff reports she has been unable to work because of

osteoarthritis; lumbar degenerative disc disease (DDD) with radiculopathy; carpal tunnel syndrome (CTS); thoracic outlet syndrome (TOS); chronic fatigue syndrome (CFS); myofascial pain syndrome; and patellar degenerative joint disease, anserine bursitis and venous insufficiency (Tr. 22).

Plaintiff has an extensive history of treatment for neck pain, bilateral knees, carpal tunnel, and vision problems. As early as April 1995, available records indicated an abnormal median nerve somatosensory evoked-study that correlated with the diagnosis of thoracic outlet syndrome. (Tr. 263-270). Plaintiff also underwent a cerebral arterial Doppler (Tr. 304-306). The study showed early atherosclerotic disease findings, calcifications of both carotid arteries and abnormal right intra cranial circulation. Plaintiff was also treated for blurred vision due to systemic disease (Tr. 290) . Plaintiff was diagnosed with myopia and lattice degeneration of both eyes.

Between September 15, 1997 through August 1998, Dr. Antonio Umpierre treated Plaintiff for blurred vision (Tr. 287-288, 296-297). Examination revealed small macular holes of both eyes. Plaintiff was diagnosed with poor vision of the left eye. As of February 1, 1999, Plaintiff still reported difficulty seeing near and far (Tr. 293). Plaintiff was diagnosed with macular hole and lattice degeneration and was prescribed a four coil hand held magnifier.

On May 16, 2000 Dr. Paul Rivera examined Plaintiff (Tr. 215-217). Plaintiff had been receiving therapy since February 16, 2000 and was diagnosed with obsessions, arterial

hypertension, cervical sprain and fibromyalgia by Dr. Rivera. (Tr. 215-317).  Plaintiff's neck

pain and back pain continued. By May 2002, Plaintiff reported constant pain on the left hip,

buttock, and left abdomen and in both knees especially when walking. (Tr. 191-192).

Plaintiff reported numbness of both hands and difficulty rising from a chair.  Examination

revealed pain with touch to her hands and both knees.

     Between March 28, 2003 and April 4, 2003, Dr. Roura, an orthopedist, examined

Plaintiff for knee pain (Tr. 183, 256).  Bilateral knee x-rays performed on March 28, 2003

revealed narrowing of the medial knee joint compartment, a suspected small bony spur in

the intercondyloid of the tibia (findings probably related to arthritis), and the left knee

showed narrowing of the medial knee joint compartment (Tr. 183). The left ankle x-ray

showed a small bone density adjacent to the tip of the lateral malleolus that could be an old

small cortical avulsion fracture and or periarticular calcification.  Cervical spine x-rays

performed on April 4, 2003 showed "[m]inimal spondyloarthritic changes and straightening,

probably muscle spasms (Tr. 258)." An x-ray of the dorsal and lumbar spine showed

straightening and osteoarthritic changes were noted in left and right knee. A right ankle x-

ray showed an old non-union fracture at the tip of the lateral malleolus.

     On April 15, 2003, Dr. J. Arabia examined Plaintiff for hand pain (Tr. 185-186).

Examination revealed Plaintiff was overweight and she was diagnosed with lumbar sprain

and osteoarthritis of the knees. Plaintiff was treated with physical therapy, exercises and

paraffin to her right hand.

Plaintiff was examined on April 23, 2003 by Maria Rodriguez Lebron (Tr. 187-189). Plaintiff had fallen on March 28, 2003 and had numbness and constant pain in both hands that radiated to the forearms with weakness in both hands. Both hands went numb while writing and she reported constant pain and severe neck spasms. Plaintiff further described headaches, constant low back pain that radiated into her hips, and pain in both knees and when rising from a chair. Both knees locked up and she had increased pain to all areas when seated, standing or lying for a long period of time. Plaintiff was diagnosed with right-sided cervical and lumbar sprain. On June 3, 2003, an MRI of the left and right knee showed medial meniscal tear, associated joint effusion and mild chronic degenerative joint disease changes of osteoarthritis (Tr. 256-257). An MRI of the cervical spine dated July 8, 2003 showed cervical spondylosis, mild with no disc herniation (Tr. 254).

On July 14, 2003, Plaintiff was treated by Dr. Jose Arabia for cervical and lumbar sprain (Tr. 165). Plaintiff reported continued feelings of pain in her entire body and waking up tired with pain everywhere. Plaintiff was diagnosed with cervical and lumbar sprain, osteoarthritis of her knees and carpal tunnel syndrome (CTS) of the right hand. A right knee x-ray was performed on September 3, 2003 that showed osteoarthritic changes and narrowing of the articular spaces and small soft tissue calcific deposit near the tibiofibular region (Tr. 429). Plaintiff was treated for pain with injections in September 2003 (Tr. 164).

On December 12, 2003, Plaintiff underwent right knee x-rays ordered by Dr. Roura that again showed narrowing of the medial knee joint compartment and suspected a small

bony spur in the intercondyloid eminence of the tibia, probably related to arthritis (Tr. 259-260).

Between March 2004 through May 2004, Dr. Aura Ceaser treated Plaintiff for depression (Tr. 175-177, 213-218). Examination revealed she was overweight and cried at times. Her state of mind was sad, anxious and frustrated and her concentration was low. She was diagnosed with depressive disorder.  Plaintiff was anxious so her medication dosages were increased (Tr. 217-218).  Plaintiff also described increased pain in May 2004 (Tr. 213-214).

An EMG study performed on April 28, 2004 again confirmed bilateral carpal tunnel syndrome (Tr. 426). An MRI of the lumbar spine was performed in May 2004 that showed straightening of the lumbar lordosis compatible with muscle spasms and/or lumbar myositis, dehydrated nucleous pulposus at L2-L5, and lower lumbar rotary levoscoliosis with apex at L4.

Plaintiff was treated on May 26, 2004 by neurologist, Dr. H.R. Stella (Tr. 206).  An EMG and nerve conduction revealed bilateral S1 radiculopathy and bilateral CTS. Examination revealed pain with flexion, extension, and lateral movements and tenderness to palpation to her lumbar and dorso-paravetebral muscle. Plaintiff was diagnosed with cervical, lumbar, and dorso sprain, bilateral S1 radiculopathy and carpal tunnel syndrome. Plaintiff was prescribed Skelaxin and Neurontin.

On July 12, 2004, Plaintiff underwent arthroscopic surgery on her left knee.  Plaintiff

-8-

was discharged on July 13, 2004, with a diagnosis of left knee meniscus tear (Tr. 134).

Dr. Ceaser continued to treat Plaintiff for depression from August 2004 through October 2004 (Tr. 200, 202, 480) .  Dr. Ceaser reported Plaintiff "[f]elt empty, did not want to do anything, and just wanted to stay in bed."  Plaintiff's medications were adjusted.

Plaintiff continued to suffer from ongoing right knee pain as of October 2004.  She underwent a right knee arthroscopy and medial lateral menisectomy and chondroplasty. She was discharged on October 26, 2004 with a diagnosis of a right knee meniscus tear.

Plaintiff was examined on November 9, 2004 by Dr. Reinaldo Kianes (Tr. 415-417). Examination revealed she was obese, had sporadic eye contact, mild retarded motor activity, was tearful at times and had sad facial expressions. Her mood was depressed and feelings of low self esteem were verbalized. She was diagnosed with major depression.

Bilateral knee x-rays were performed on November 22, 2004 by a radiologist that showed mild genus varus deformity, narrowing of both medial articular spaces associated to small patellar condylar, and intercondylar degenerative hypertrophic changes, degenerative joint disease (Tr. 404).

At the request of the state agency, on November 22, 2004, Dr. Carlos Pantojas, a rheumatologist, examined Plaintiff (Tr. 405-414).  Plaintiff  reported body and joint pain for the past ten years that was constant and worse in her lower back. Her pain diffusely radiated to her upper back and legs with numbness and weakness. Movement and walking worsened the pain and she reported insomnia, memory problems, and headaches. Examination

revealed edema in her lower extremities, trigger points on both trapezius and lumbosacral

areas, bilateral anserine bursitis, and bilateral knee crepitus. She had decreased strength in

her lower extremities due to pain. She was diagnosed with high blood pressure,

hyperlipidemia by history, myofascial pain syndrome, bilateral anserine bursitis, bilateral

knee crepitus, lumbar radiculopathy, bilateral CTS and venous insufficiency. She presented

problems with long sustained sitting or standing, walking long distances and had definite

problems lifting and carrying moderate to heavy objects. Plaintiff had pain in her right and

left hands and could  perform functions with her hands for only short periods of time.

Plaintiff ambulated with a rigid spine and used a cane in her right hand.

On November 24, 2004, Dr. Fisiatra examined Plaintiff for knee pain (Tr. 352). She

presented for follow up status post right and left knee surgery. Examination revealed she had

marked crepitance of the left knee and her quad/hamstring strength was 4/5.  Plaintiff was

prescribed Lodine XL and Neurontin.  Plaintiff  re-injured her knee and was treated by

Dr. Manguel in January 2005 (Tr. 350) . She was discharged from orthopedic care but

advised she might need a total knee replacement in the future.

Plaintiff continued to suffer from lumbar pain and knee pain. On January 13, 2005,

Dr. Melendez treated Plaintiff for lumbar strain (Tr. 172) . Plaintiff had weakness of both

knees and reported falling recently. Plaintiff was advised to stop physical therapy and was

referred for an MRI of the lumbar spine.  The MRI of the lumbar spine was performed on

March 31, 2005 and showed status post partial medial meniscectomy with suspected tears at

the posterior horn, degenerative joint disease, chondromalacia[9] patella, and joint and bursa effusions, including a baker's cyst (Tr. 245). As of April 2005, Plaintiff was noted to have a fair to poor prognosis for chronic lumbar, dorso, and cervical pain with bilateral sciatica[10] syndromes, left carpal tunnel syndrome, and complex pain. (Tr. 197).

Plaintiff had a CT scan of the pelvis and abdomen on September 12, 2007 due to a hepatic lesion (Tr. 162). The CT scan revealed hepatic granuloma, degenerative disc disease, and annular bulge at L2-L4 levels.   An endoscopy performed in October 2007 revealed chronic gastritis (Tr. 160).

On February 21, 2008, Dr. Lopez opined that Plaintiff could not sit down or stand up for long and therefore it was impossible for her to go to Florida to be part of a jury (Tr. 159). She had been treated for years and suffered from cervical and lumbar sprain, bilateral S1 radiculopathy, osteoarthritis of both knees and depression and anxiety disorder.

Plaintiff was still being treated for depression on May 19, 2008 by Dr. Mercedes (Tr. 158).

**B.     SPECIFIC ISSUES**

> **I.     COMMISSIONER FAILED TO ARTICULATE REASONS FOR NOT CREDITING THE OPINIONS OF PLAINTIFF'S TREATING PHYSICIAN AND COMMISSIONER'S CONSULTATIVE EXAMINER**

The Plaintiff argues that the ALJ did not acknowledge the existence of two contrary medical opinions as to functional limitations - one from Plaintiff's treating provider (Dr.

Lopez) and one from the Commissioner's own consultative provider (Dr. Pantojas).  The

ALJ failed to explain why he was not crediting the opinions as to functional capacity.  The

ALJ's finding that Plaintiff can lift up to 50 pounds occasionally and walk/stand/sit for six

hours out of an eight hour day without restriction is unreasonable given the medical

evidence and the medical opinions of the treating provider and the Commissioner's own

consultative rheumatologist.

Dr. Lopez of the Everest Medical Center wrote that Plaintiff had been treated many

times in Puerto Rico and Plaintiff suffered from cervical sprain with degenerative disease,

lumbosacral sprain with discogenerative disease, bilateral S1 radiculopathy, osteoarthritis of

both knees, and depression and anxiety disorder.  Further, that Plaintiff is not able to sit

down or stand up for any length of time.

The record substantiates that the ALJ's decision directly conflicts with this opinion

because the ALJ concluded that Plaintiff  could perform standing/walking for six hours per

eight hour day and sitting for six hours out of an eight hour day. Yet Dr. Lopez did not even

think his client could perform on a jury because of her limitations and specifically noted she

could not stand up for "too long."  Dr. Lopez's  opinion as to Plaintiff's limitations are

inconsistent with the ALJ's medical conclusions.  Thus, the ALJ failed to acknowledge Dr.

Lopez's  opinion and articulated no reasons for not crediting his opinion as a treating source

for Plaintiff.

Dr. Pantojas is a consultative examining rheumatologist who examined Plaintiff on November 22, 2004 at the request of the Commissioner (Tr. 405-414). Plaintiff continually reported and the record documents having body and joint pain for the past ten years and that the pain was constant and worse in her lower back. Plaintiff maintained that the pain diffusely radiated to her upper back and legs with numbness and weakness. Movement and walking worsened the pain and she reported insomnia, memory problems, and headaches. The ALJ claimed that Dr. Pantojas' diagnoses were unsupported by his examination findings but as noted above, Dr. Pantojas listed multiple examination findings that were indicative of abnormalities. For example, examination revealed edema in her lower extremities, trigger points on both trapezius and lumbosacral areas, bilateral anserine bursitis, and bilateral knee crepitus. Plaintiff also had decreased strength in her lower extremities due to pain. The record shows Dr. Pantojas performed a quite extensive examination of Plaintiff.

The ALJ gave general observations to Dr. Pantojas' opinions. The ALJ failed to address any of the abnormal examination findings noted by Dr. Pantojas. In addition, no where in the record did the ALJ actually even describe the extent of the limitations suggested by Dr. Pantojas. In addition, Dr. Pantojas' opinion is consistent with Dr. Lopez's 2008 opinion that Plaintiff cannot stand or sit for "too long"– the ALJ did not even recognize that the treating source opinion and the consultative examiner's opinion (albeit

four years apart) both provide that Plaintiff cannot perform prolonged sitting/standing. Yet, the ALJ concluded that Plaintiff can stand/walk and sit for 75% of an eight hour workday – without any need to change positions.

The ALJ failed to articulate specific legitimate reasons for not crediting the opinions of both Dr. Lopez and Dr. Pantojas. Indeed, their opinions are consistent with Plaintiff's medical history of continuous knee problems and lumbar spine problems.[3]

On January 13, 2005, Dr. Melendez treated Plaintiff for lumbar strain (Tr. 172). Plaintiff still had weakness of both knees and reported falling recently. She was told to stop physical therapy and she was referred for an MRI of the lumbar spine. The MRI of her lumbar spine was performed on March 31, 2005 and showed status post partial medial meniscectomy with suspected tears at the posterior horn, degenerative joint disease, chondromalacia patella, and joint and bursa effusions, including a baker's cyst (Tr. 245).

As of April 2005, Plaintiff was noted to have a fair to poor prognosis for chronic lumbar, dorso, and cervical pain with bilateral sciatica syndromes, left carpal tunnel syndrome, and complex pain (Tr. 197). Dr. Pantojas' opinion is consistent with the above diagnoses and also with Dr. Lopez' treating opinion in 2008.

---

[3]     This file is admittedly complicated due to the need for interpretation of medical records – some of which were not translated. Still, the record is quite clear as to the nature of her issues.

The regulations require that the findings of the treating physician as to the severity of an impairment be accorded controlling weight if they are well-supported by medically accepted clinical and laboratory diagnostic techniques and are not inconsistent with the other substantial evidence in the record. *See* 20 C.F.R. § 404.1527(d)(2). The cited regulation acknowledges that more weight should be granted to the opinions of a treating source because:

> "[T]hese [treating] sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations.

20 C.F.R. § 404.1527(d)(2).

The Eleventh Circuit has reaffirmed that the testimony of a treating physician must be given substantial or considerable weight unless "good cause" is shown to the contrary. *Phillips v. Barnhart*, 357 F.3d 1232, 1240 (11th Cir. 2004). The court noted that it has concluded that "'good cause' exists when the: (1) treating physician's opinion was not bolstered by the evidence; (2) evidence supported a contrary finding; or (3) treating physician's opinion was conclusory or inconsistent with the doctor's own medical records" and that when electing to disregard the opinion of a treating physician, the ALJ must clearly articulate its reasons, *Lewis v. Callahan*, 125 F.3d 1436, 1440 (11th Cir.1997).

As noted above, the ALJ barely discussed Dr. Pantojas' diagnoses and failed to acknowledge with any specificity the contrary functional opinions issued by Dr. Pantojas, even though he was retained by the Commissioner. The ALJ did not articulate any reasons or acknowledge Dr. Lopez's contrary opinion as to the inability to perform sitting or standing for "too long" and her inability to serve on a jury for this reason.

Substantial evidence supports the physicians' opinions that Plaintiff is unable to work and that the ALJ failed to articulate adequate and specific reasons for discrediting the physicians' opinions.  This case is therefore reversed and remanded for proper consideration of the consistent medical opinions reflected in the record.

II.      **The Commissioner erred in finding that Plaintiff could perform her past work as a security guard because (1) there is no evidence that she performed the work at the level of "substantial gainful activity;" [4] (2) the Commissioner failed to analyze the mental requirements of Plaintiff's past work;**

The ALJ improperly concluded that  Plaintiff was not disabled at Step Four of the sequential analysis because he determined  she could perform her past work as a "security guard." It must be noted that this occupation was performed more than fifteen years prior to the ALJ's decision being rendered and was not performed to the earnings level required of substantial gainful activity and second, the ALJ's conclusion that the job of security guard would accommodate "moderate losses of attention span" is inconsistent with the very nature

---

[4]      "[T]he occupation of security guard is a semi-skilled job that requires the ability to engage in a higher level of reasoning and, by definition, would not be consistent with "moderate losses of attention span."

-16-

of security guard work and also with the description of the occupation by the Dictionary of Occupational Titles ("DOT").

Plaintiff bears the burden of proving she cannot meet the physical and mental demands of her past relevant work, either as she performed it in specific past employment or as the work is generally performed in the national economy. *Jackson v. Bowen,* 801 F.2d 1291, 1293 (11 Cir.1986). The ALJ, however, must first develop a full and fair record concerning the issue. *Schnorr v. Bowen,* 816 F.2d 578, 681 (11 Cir.1987). "In the absence of evidence of the physical [or mental] requirements and demands of [the plaintiff's] work the ALJ could not properly determine that she retained the residual functional capacity to perform it." *Nelms v.. Bowen,* 803 F.2d 1164, 1165 (11 Cir.1986);  *Lucas v.. Sullivan,* 918 F.2d 1567, 1574 (11 Cir.1990); *Schnorr v. Bowen,* 816 F.2d at 581.

The Commissioner's own instructions are even more explicit. "In finding that an individual has the capacity to perform a past relevant job, the determination or decision must contain among the findings the following specific findings of fact: ... 2. A finding of fact as to the physical and mental demands of the past job/occupation." *SSR 82-62.*  A case relying on a finding that Plaintiff can return to her past relevant work " will contain enough information on past work to permit a decision as to the individual's ability to return to such past work.... Adequate documentation of past work includes factual information about those work demands which have a bearing on the medically established limitations. Detailed information about ... mental demands and other job requirements must be obtained as

-17-

appropriate. This information will be derived from a detailed description of the work obtained from the claimant, employer, or other informed source." *SSR 82-62.*

The ALJ's decision was dated in August 2008 (Tr. 29). The record indicates that the work as a security guard was likely performed in 1990 ($1,402.75) and 1991 ($462.00). (Tr. 104).  According to documentation filled out by Plaintiff, she was unsure when she worked as a security guard or how long she worked at the job but did indicate that she worked two days a week for sixteen hours a day (Tr. 23).  Plaintiff  does not describe any of her job duties, except that she worked in a "Court Office."  There is no other evidence in the record regarding her past work as a security guard. The ALJ concluded that Plaintiff retained the "RFC" to work as a "Spanish speaking security guard" because the job was performed within the past fifteen years. (Tr. 28)  Listing "security guard" as past relevant work for Plaintiff was an error on the part of the ALJ because the job was not performed within 15 years and  was not performed at a level sufficient to be considered substantial gainful employment ("SGA"). According to 20 C.F.R. § 404.1560(b) (2009), to be "relevant," past work must have (1) been done within last 15 years; (2) lasted long enough for claimant to learn to do it; and (3) been substantial gainful activity ("SGA"). Under 20 C.F.R. § 404.1574 (b)(2) (2006), between the years of 1990-1999, earnings of less than $500 per month generally established that the claimant did not engage in "SGA".

If an occupation was not performed at "SGA", as a matter of law, the regulations provide that the occupation cannot be considered past relevant work. The ALJ failed to enter

into any analysis of this issue. The ALJ was required to consider the factors set forth in §404.1574(b)(6)(iii) to determine whether the work should be considered "SGA". The ALJ's decision gave no indication that he applied the regulations, that her earnings did not exceed the amount for "SGA", or that he considered the factors specified in §404.1574(b)(6)(iii).

The ALJ determined that Plaintiff had "lapses in attention" yet determined that Plaintiff could perform the job of security guard.  The ALJ thus failed to provide any analysis of the mental requirements of a security guard, simply stating that he thought she could perform "at least the simple light job of guard."   Further, the ALJ did not ask Plaintiff any questions about her past work as a security guard and the ALJ did not cite to the DOT or any vocational resource.

As noted by the Eleventh Circuit,"[i]n the absence of evidence of the physical [or mental] requirements and demands of [plaintiff's] work the ALJ could not properly determine that she retained the residual functional capacity to perform it." *Nelms v. Bowen,* 803 F.2d 1164, 1165 (11 Cir.1986). SSR 82-62 also requires adequate documentation of past work, including factual information about those work demands which have a bearing on the medically established limitations. Detailed information about mental demands and other job requirements must be obtained as appropriate. "This information will be derived from a detailed description of the work obtained from the claimant, employer, or other informed sources."

The ALJ concluded that Plaintiff had moderate losses of attention span. This description is vague and lacks the required specificity to permit judicial review because it fails to identify the extent of the inattention. In addition, the occupation of "security guard" would  requires attention to detail. "A security guard's duty would be to pay attention to make sure the area is secure)".  A lapse in attention can lead to a security breach.

The occupation of security guard (as defined by the Dictionary of Occupational Titles) is considered a semi-skilled job. There are two occupations entitled "security guard" in the DOT – 372.667-036 and 372.667-038. One is it is unclear which one applies to Plaintiff since the ALJ did not make specific findings regarding the work of security guard and the mental requirements of the work. Both occupations require the ability to work under stress, and both require inspection and guarding of premises and both require at least the ability to handle at least detailed instructions. The ALJ pointed to no vocational evidence or any evidence that supports the conclusion that the occupation would allow moderate lapses in concentration or attention. A security guard mainly has to pay attention – if he or she cannot do this on a sustained basis, the job would be precluded. The ALJ erred in finding that Plaintiff can perform the job of security guard despite moderate periods of inattention.

Substantial evidence supports that Plaintiff could not perform her past relevant work and/or performed any substantial gainful activity.  The ALJ failed to apply the regulations governing the analysis of past relevant work and "SGA".  Therefore, reversal and remand is

-20-

required for further fact finding.

C.      **CONCLUSION**

For the foregoing reasons, the ALJ's decision is inconsistent with the requirements of law and not supported by substantial evidence.

Accordingly, the decision of the Commissioner is **REVERSED AND REMANDED** with instructions to:

(1)      Inquire and analyze the mental requirement of Plaintiff's past work as a security guard;

(2)      Hold a supplemental hearing to obtain additional testimony to clarify Plaintiff performing the job of security guard when she has lapses in attention;

(3)      Address the issue of Plaintiff performing substantial gainful activity and her ability to perform her past relevant work; and issue a new decision.

Further,

(4)      That should the final judgment state that Plaintiff ultimately prevails in this case upon a remand to the Social Security Administration, any motion for attorney's fees under 42 U.S.C. 406(b) must be filed within fourteen (14) days of the Award Notice of Benefits.  *Bergen v. Commissioner of Social Security,* 454 F. 3d 1273, 1278, n.2 (11th Cir. 2006).

(5)     The Clerk of the Court is directed to enter judgment and thereafter close the

file.

**DONE AND ENTERED** in Chambers at Fort Myers, Florida, this 7th   day

December,  2010.


DOUGLAS N. FRAZIER
UNITED STATES MAGISTRATE JUDGE



The Court Requests that the Clerk
Mail or Deliver Copies of this Order to:


Susan Roark Waldron, A.U.S.A.
Carol Avard, Esquire